IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **LINCOLN PROVISION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | 8:10CV344 |
| | ) | |
| V. | ) | |
| | ) | |
| **ARON PURETZ, PMP, LLC, and** | ) | ORDER |
| **HASTINGS ACQUISITION, LLC,** | ) | |
| nominal defendant, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

This matter is before the Court on Defendants' motion for summary judgment (filing 139), as well as Defendants' motion requesting that it be permitted to file an amended answer and counterclaim. (Filing 126.) For the reasons set forth below, each of these motions will be denied.

**FACTUAL BACKGROUND**

On or about March 4, 2010, Plaintiff Lincoln Provision, Inc. ("Plaintiff" or "Lincoln") and Defendants Aron Puretz ("Puretz") and PMP, LLC formed Defendant Hastings Acquisition, LLC ("Hastings"), an Illinois limited liability company. (Filing 1.) Puretz and Plaintiff are listed as Hastings' sole members on Hastings' Articles of Organization. (*Id*.)

Hastings was formed, at least in part, for the purpose of engaging in bids to acquire assets offered for sale and sold by a bankruptcy trustee in a proceeding in the United States Bankruptcy Court for the District of Nebraska. (*Id*.) Accordingly, following its formation, Hastings successfully bid on those assets and ultimately acquired title to a bovine slaughter and processing plant real estate located in Adams County, Nebraska (the "Hastings Plant"), as well as a bovine processing facility real estate in Lancaster County, Nebraska (the "Lincoln Plant"). (*Id*.) Puretz contributed $150,000 of the required $250,000 deposit necessary to submit the bid to the Bankruptcy Court and Plaintiff contributed the additional

$100,000.  (Filing 146.)

After the bankruptcy auction, Hastings entered into agreements for the purchase of the Hastings and Lincoln Plants from the Bankruptcy Trustee of Premium Protein Products, LLC.  (Filings 141-17 & 141-18.)  These purchase agreements conditioned closing upon the Bankruptcy Court entering an order approving the sale.  (*Id*.)  On May 24, 2010, the Bankruptcy Court entered an order approving the sale of the Plants for $3.9 million dollars.  (Filing 141-19.)  On June 30, 2010, Puretz provided the funds that Hastings needed to close the purchase of the Plants.  It does not appear that Plaintiff contributed funds in connection with the closing transaction.  (Filing 143.)

Following Hastings' formation in March, 2010, Plaintiff and Puretz engaged in seemingly extensive negotiations for an operating agreement to govern Hastings.  The parties seem to agree that they never reached an agreement regarding all terms that would govern Hastings' operations.  However, Defendants maintain that an agreement was reached with respect to what a member would receive for its distributional interest.  In particular, Defendants claim that an agreement was reached at a meeting held in Chicago, Illinois on June 21, 2010. (Filing 143.)  Defendants maintain that the terms of the agreement are set forth in an unsigned memorandum prepared following the Chicago meeting.  This memorandum provides, in part:

> If not settled by July 2nd, the party that is not prepared to close will be taken out by the performing party, made whole (original cash back) and the performing party then has 100% ownership.

(Filing 141-58.)  Plaintiff denies that an agreement was reached at the meeting, or at any other time.

On July 2, 2010, Plaintiff provided Defendants with a letter expressing its intent to dissociate from Hastings.  (Filing 141-29.)  Defendants contend, however, that Plaintiff actually dissociated on June 6, 2010.  Defendants claim that Plaintiff's dissociation on June 6, 2010, is evidenced by email correspondence exchanged between the parties.  (Filing 143.)

On August 16, 2010, Plaintiff filed suit in the District Court of Adams County, Nebraska seeking a determination of the value of its interest in Hastings under the Illinois Limited Liability Company Act, 805 Ill. Comp. Stat. 180/1-1 *et seq.*. (Filing 1.)

On May 9, 2012, following the institution of this suit, Puretz, as the sole voting member of Hastings, executed a Limited Liability Company Agreement, which includes the following provisions:

> 3.1.2   Effect of Failure to Make Initial Capital Contribution.
>
> a) If a Member fails to contribute any services that it agreed to provide for its agreed initial Capital Contribution, the defaulting Member shall be obligated to make an initial Capital Contribution equal to the agreed Cash Contribution of a Member that did not agree to provide services as part of his or its initial Capital Contribution, so that each Member will contribute in cash in such event an amount equal to such Member's economic percentage times the total of all Members' initial cash Capital Contributions. Accordingly, Lincoln is presently obligated to contribute to the Company the same amount of cash that Puretz contributed, which amounts to the principal sum of $2,730,000 less $100,000 for the cash contribution Lincoln has already made, or $2,630,000.
>
> b) A Member that fails to make his or its initial Capital Contribution shall be indebted to the Company for such Capital Contribution in accordance with the provisions of the Act and shall pay interest on such agreed Capital Contribution at such equitable rate of interest as a court of competent jurisdiction shall deem appropriate under Illinois law from and after the date the non defaulting Member made his or its agreed Capital Contribution.
>
> 3.4.   Return of Capital Contributions.
>
> Except as otherwise provided in this Agreement, no Member or Transferee has the right to receive the return of any Capital Contribution made to the Company.
>
> 9.3   Dissociation.
>
> The occurrence of a Dissociation Event causes a Dissociation of the affected

Member. Upon the occurrence of a Dissociation Event, the Dissociated Member shall forthwith become a Transferee and remain an Interest Holder, but shall not remain a Member of the Company.

9.3.1   Unrestricted Power.

No party may restrict the power of a Member, to dissociate or otherwise disconnect from ownership or other interests in or with the Company, except to the extent allowed by the Act. Upon a Member's Dissociation, the Company shall have neither the right nor the obligation to purchase the Dissociated Member's Interest.

9.3.2   Termination of Member's Voting and Managerial Rights.

Upon the occurrence of a Dissociation Event, the resulting Dissociated Member shall:

- a) cease to be a Member of the Company;
- b) become a Transferee; and
- c) lose the right to inspect records and participate in the management, conduct, and dissolution of the Company's Business.

10.4   Complete Agreement.

This Agreement constitutes the complete and exclusive statement of the agreement among the Members and Transferees. It amends, restates, and supersedes the existing operating agreement of the Company, and all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

10.7   Binding Provisions; Time is of the essence.

Subject to the limitations on transferability contained herein, this Agreement binds and inures to the benefit of each Member and Transferee that now owns or hereafter owns an Interest in the Company and their respective heirs, legal representatives, successors, and assigns. Subject only to the rights of any party who shall obtain a charging order, an amendment to this Operating Agreement

or to any prior operating agreement, made after a person becomes a Transferee or Dissociated Member is effective with regard to any debt, obligation, or other liability of the limited liability company or its members to the person in the person's capacity as a Transferee or Dissociated Member. Time is of the essence of this Agreement.

(Filing 141-46.)  Defendants maintain that this is Hastings' effective operating agreement. (Filing 143.)  Plaintiff never reviewed or agreed to the terms set forth in this agreement. (Filing 146.)

## MOTION FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion.  *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate its allegations with "sufficient probative evidence [that] would permit a finding in [its] favor on more than mere speculation, conjecture, or fantasy." *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (citation and quotation omitted). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.*  Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Defendants make several arguments in support of their summary judgment motion. Each argument will be addressed, in turn, below.

    **1.**    **Dismissal of Defendant Aaron Puretz**

Defendants claim that Plaintiff has failed to assert a plausible claim against Puretz

individually and, as a consequence, Puretz should be dismissed from this action. The Court disagrees.

Plaintiff's Complaint contains numerous assertions generally alleging that Puretz ousted Plaintiff and grabbed a business opportunity. Specifically, the Complaint alleges that Puretz took control of Hastings and excluded Plaintiff from control by (1) appointing his lawyer to appear for Hastings as counsel in the bankruptcy proceedings without Plaintiff's consent and taking control of Hastings' involvement in those proceedings; (2) interfering with, and taking control of, communications with vendors and potential customers by commandeering Plaintiff's business plan or its implementation; (3) controlling communications with vendors, including the insurance vendor, and making the decision to permit the premises to be uninsured notwithstanding requests by Plaintiff that it be insured; (4) negotiating contracts, including negotiating employment arrangements with management personnel; (5) dealing with the City of Hastings and County of Adams to the exclusion of Plaintiff; and (6) otherwise dominating Hastings to the exclusion and oppression of Plaintiff. (Filing 1.) The Complaint further alleges that Puretz learned of Plaintiff's business plan, refused to cooperate with Plaintiff to make Hastings viable, endeavored to oust and oppress Plaintiff, and acted wrongfully and in violation of his fiduciary duties. (*Id*.) *See* 805 Ill. Comp. Stat. 180/15-3 (stating that a member-manager owes fiduciary duties of loyalty and due care to the limited liability company and its other members).

Defendants contend that these allegations do not state a realizable claim against Puretz because Plaintiff consented to Hastings' acquisition of the Plants without Plaintiff's involvement and also consented to Puretz taking over the company by dissociating on June 6, 2010. Defendants further argue that Plaintiff has not alleged that any damage occurred to Hastings by reason of Puretz's alleged actions. The Court is not persuaded by Defendants' arguments. Plaintiff did allege in its Complaint that Puretz refused to cooperate with Plaintiff to make Hastings a viable company. Moreover, there is a factual dispute as to when Plaintiff dissociated and terminated its membership rights. The allegations contained in the Complaint are sufficient to state a plausible claim against Puretz in his personal capacity, especially given the multitude of factual disputes existing in this case and Puretz's present status as the sole member of Hastings.

## 2. Ripeness

Defendants argue that Plaintiff's claim is not ripe for adjudication because Plaintiff failed to wait the statutorily-required time period before commencing suit. 805 Ill. Comp. Stat. 180/35-60 provides:

> (a) A limited liability company shall purchase a distributional interest of a member for its fair value determined as of the date of the member's dissociation if the member's dissociation does not result in a dissolution and winding up of the company's business under Section 35-1.
>
> (b) A limited liability company must deliver a purchase offer to the dissociated member whose distributional interest is entitled to be purchased not later than 30 days after the date determined under subsection (a) of this Section. The purchase offer must be accompanied by:
>
> > (1) a statement of the company's assets and liabilities as of the date determined under subsection (a) of this Section;
> >
> > (2) the latest available balance sheet and income statement, if any; and
> >
> > (3) an explanation of how the estimated amount of the payment was calculated.
>
> (c) If the price and other terms of a purchase of a distributional interest are fixed or are to be determined by the operating agreement, the price and terms so fixed or determined govern the purchase unless the purchaser defaults. If a default occurs, the dissociated member is entitled to commence a proceeding to have the company dissolved under Section 35-1.
>
> (d) If an agreement to purchase the distributional interest is not made within 120 days after the date determined under subsection (a) of this Section, the dissociated member, within another 120 days, may commence a proceeding against the limited liability company to enforce the purchase. The company at its expense shall notify in writing all of the remaining members, and any other person the court directs, of the commencement of the proceeding. The jurisdiction of the court in which the proceeding is commenced under this subsection (d) is plenary and exclusive.

805 Ill. Comp. Stat. 180/35-60. Defendants argue that this statute obligated Plaintiff to wait for the expiration of 120 days after dissociation before filing suit for fair value and that because Plaintiff failed to do so, summary judgment is appropriate.

It is undisputed that Plaintiff filed suit on August 16, 2010, in the District Court of Adams County, Nebraska. However, the parties dispute the date that dissociation occurred. Defendants, relying largely on email correspondence exchanged between the parties, claim that dissociation occurred on June 6, 2010, while Plaintiff maintains that it did not dissociate until July 2, 2012. Plaintiff supports its position with a letter from Plaintiff's counsel, David Domina ("Domina"), which expressly states Plaintiff's intention to dissociate from Hastings. In any event, no matter the date of dissociation, the result is the same: Defendants' ripeness argument fails.

The parties dispute whether a purchase offer was made to Plaintiff within 30 days of dissociation. Defendants claim that they offered to purchase Plaintiff's membership interest on at least two separate occasions, including in an email dated June 28, 2010, from Puretz's counsel, Robert Rimberg ("Rimberg"), to Domina. However, the email not does purport to be an offer to purchase. In fact, the email actually suggests that dissociation had not yet even occurred. The email provides, in part: "Of course, [Plaintiff] must dissociate from Hastings Acquisitions LLC by conveying all their rights, title and interests in Hastings Acquisitions LLC to the Puretz entity." (Filing 141-100.) At any rate, the email clearly does not contain the statements required by 805 Ill. Comp. Stat. 180/35-60 for a valid purchase offer, specifically (1) a statement of the company's assets and liabilities; (2) the latest available balance sheet and income statement, if any; and (3) an explanation of how the estimated amount of the payment was calculated. Defendants also maintain that they offered to purchase Plaintiff's distributional interest for the sum of $100,000 in an email from Rimberg to Domina dated July 12, 2010. The email states:

> It has been almost a week since we last spoke. As discussed, your clients wish no participation in the slaughterhouses, which is evident by their failure to come up with any of the required funds and your letter attached to your e-mail of July 2, 2010. My clients have no issue in returning the $100,000 paid to date in consideration for your clients transferring any and all interest in

> Hastings Acquisitions LLC to my clients, however, as I mentioned in our conversation, my clients need to be comfortable that during the period your clients were at the plants there are no lingering liabilities.

(Filing 141-106.) Again, this email falls short of complying with the requirements of 805 Ill. Comp. Stat. 180/35-60.

Without an initial purchase offer made within 30 days of dissociation, Plaintiff had no duty to wait 120 days before bringing suit. In *Cogniplex, Inc. v. Ross, LLC,* Nos. 00 C 7463, 00 C 7933, 2002 WL 483411, *2 (N.D. Ill. Mar. 29, 2002), in discussing the time limitations imposed by 805 Ill. Comp. Stat. 180/35-60, the United States District Court for the Northern District of Illinois explained:

> Section 35-60 requires a dissociating member to afford an LLC 30 days to offer to purchase the interest of the dissociating member to avoid judicial intervention and possible complete dissolution of the LLC. If such a purchase offer is made, the offer must ripen into agreement within 120 days. If it does not, the member has an additional 120 days to commence a proceeding to enforce the purchase under terms set by a court. Section 35-1 provides that an LLC must be dissolved and its business wound up if the LLC fails to comply with the methods specified in § 35-60 for purchase of a dissociating member's interest . . .
>
> However, a dissociating member must follow the procedures and time limits imposed by § 35-60(d) only if the LLC offers to purchase his or her interest within 30 days after the date of dissociation. If the LLC does not make such a purchase offer within 30 days, the dissociating member may seek dissolution under § 35-1 without further delay.

*Cogniplex,* 2002 WL 483411 at *2. As interpreted by this Illinois court, Plaintiff's obligation under 805 Ill. Comp. Stat. 180/35-60 to wait 120 days before bringing suit hinged upon receipt of the initial purchase offer. At the very least, there is a factual dispute as to whether a purchase offer was ever made. Therefore, summary judgment will not be granted on this basis.

9

### 3. Judicial Estoppel

Defendants argue that Plaintiff is judicially estopped from asserting that the fair value of Hastings exceeds $3.9 million dollars because Plaintiff represented to the Bankruptcy Court that the $3.9 million dollar aggregate purchase price for the Hastings and Lincoln Plants constituted fair value. Defendants maintain that, in approving the sale and finding that the purchase price constituted fair value, the Bankruptcy Court relied upon Plaintiff's representation as to value.

The doctrine of judicial estoppel "prohibits a party from assuming a contrary position in a legal proceeding simply because that party's interests have changed." *In re Victorian Park Associates*, 189 B.R. 147, 149 (N.D. Ill. 1995) (citation omitted). "The principle is that if you prevail in Suit # 1 by representing that A is true, you are stuck with A in all later litigation growing out of the same events." *Id*. (quotation and citation omitted). "The doctrine is intended to protect the integrity of the courts, not the litigants." The doctrine of judicial estoppel is equitable in nature and its application is within the court's discretion. *Id*.

Courts examine multiple factors in evaluating the applicability of the doctrine in a particular case. *New Hampshire v. Maine*, 532 U.S. 750 (2001). For instance, courts generally look at whether (1) the party's later position is clearly inconsistent with its earlier position; (2) the party succeeded in persuading a court to accept that party's later position; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage if not estopped. *Id*. (citations omitted). Also, courts have found that for the doctrine to apply, "some type of bad faith or at least cynical gamesmanship" must be demonstrated. *In re Victorian Park Associates*, 189 B.R. 147, 150 n.4 (N.D. Ill. 1995) (quotation and citation omitted).

Having considered the matter, the Court finds that there is no basis to apply judicial estoppel in this case. It is not clear that Plaintiff has taken an inconsistent position with respect to the value of the Plants. Assuming that Plaintiff took some part in the Bankruptcy proceeding and advocated a position with respect to value at that time (a claim which Plaintiff disputes), it is not necessarily true that the Bankruptcy Court, in approving the sale,

actually accepted Plaintiff's purported representation as to value. Also, the value of the Plants at the time the sale was approved by the Bankruptcy Court is possibly different than the value of the Plants on the date of dissociation. *See In re Victorian Park Associates*, 189 B.R. 147, 150 (N.D. Ill. 1995) (refusing to apply judicial estoppel in a bankruptcy proceeding because "a key variable affecting the value of real property is time"). Moreover, bad faith on the part of Plaintiff has not been demonstrated. In short, considering the totality of the circumstances in this case, application of judicial estoppel is not warranted.

### 4. The June 21, 2010 "Agreement"

Defendants argue that Plaintiff's claims in excess of the original cash Plaintiff paid into Hastings are barred by an "agreement" that was reached between Puretz, Plaintiff, and Hastings at a meeting held in Chicago on June 21, 2010. Defendants maintain that the terms of the agreement are set forth in an unsigned memorandum prepared following the meeting. The memorandum provides, in part:

> If not settled by July 2nd the party that is not prepared to close will be taken out by the performing party, made whole (original cash back) and the performing party then has 100% ownership.

(Filing 141-58.) Defendants further argue that even if the June 21, 2010 agreement is not enforceable, Plaintiff is equitably estopped from asserting a claim for fair value. Defendants assert that they detrimentally relied on Plaintiff's alleged representation during the June 21, 2010 meeting that Plaintiff would only be entitled to recover its capital contribution upon dissociation if Puretz moved forward with the purchase of the Plants without Plaintiff.

As to each of Defendants' arguments, certain factual questions remain which preclude summary judgment. Plaintiff claims that the June memorandum only consists of notes made regarding the meeting. Plaintiff denies that an agreement was ever reached with respect to a dissociating member's interest. Plaintiff maintains that the memorandum only represents an expression of interest in continued negotiations and efforts to resolve differences between the parties. The Court notes that the parties' continued negotiations following the Chicago meeting certainly supports Plaintiff's assertion that no agreement was ever reached. This

circumstance also lends support to Plaintiff's claim that it did not represent that it would only seek to recover its contribution of capital if Puretz decided to move forward without Plaintiff's involvement. Nevertheless, due to the presence of these factual disputes, summary judgment will be denied.

### 5. The May 9, 2012 Operating Agreement

Defendants argue that the May 9, 2012 operating agreement (filing 141-46), which was drafted by Puretz's counsel nearly two-years after the commencement of this lawsuit, by its terms precludes Plaintiff, as a dissociated member, from obtaining fair value for its membership interest. Defendants argue that the Illinois Limited Liability Company Act allows members of a limited liability company to adopt an operating agreement provision that affects a dissociated member's right to fair value, particularly where the provision is consistent with a previous agreement. The Court rejects Defendants' argument.

First, while the Court is skeptical that an agreement was ever reached with respect to the distributional share of a dissociated member, at the very least, a fact issue remains as to the existence of an agreement. Second, Plaintiff's dissociation in June or July of 2010, ended Plaintiff's participation in Hastings. *See* 805 Ill. Comp. Stat. 180/35-55. The operating agreement drafted by Puretz's counsel governs the affairs of members, not a dissociated party who ceases to be a member by reason of dissociation. This conclusion is supported by the Illinois Limited Liability Company Act's definition of the term "operating agreement" as "the agreement under Section 15-5 concerning the relations among the members, managers, and limited liability company." 805 Ill. Comp. Stat. 180/1-5. The May 9, 2012 operating agreement governs Defendants, not Plaintiff.

### 6. Unclean Hands and Constructive Conditions

Defendants argue that as a result of Plaintiff's alleged failure to honor its obligation to make an initial capital contribution, Plaintiff's claims are barred by the unclean hands doctrine. The unclean hands doctrine "precludes a party from taking advantage of his own wrong. It is an equitable doctrine that bars relief when the party seeking that relief is guilty

12

of misconduct in connection with the subject matter of the litigation." *Gambino v. Blvd Mortg. Corp*, 922 N.E.2d 380, 416-17 (Ill. App. 1st Dist. 2009) (internal citations omitted). "[A]pplication of the doctrine of unclean hands is a matter for the sound discretion of the trial court." *Block v. Dardanes*, 83 Ill. App.3d 819, 828, 404 N.E.2d 807, 813 (1980).

Defendants also argue that because Plaintiff breached its obligation to make an initial capital contribution, Defendants are entitled to terminate and rescind Plaintiff's agreement to become a member of Hastings and eliminate all liability to Plaintiff. *See Eager v. Berke*, 142 N.E.2d 36, 38-39 (Ill. S. Ct. 1957) (stating that "[a] breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty") (quotation and citation omitted).

Plaintiff denies that it refused to provide its share of the funds to close. Plaintiff asserts that it was ready and willing to perform, but was effectively prevented from participating in the transaction. Based on the summary judgment record before it, the Court cannot conclude that Plaintiff acted with unclean hands or refused to perform in a way agreed to by the parties. The question of how the parties agreed to govern themselves appears to be at the heart of this case.

### 7. **Determination of Fair Value**

Defendants' summary judgment motion also seeks resolution of issues concerning the meaning of "fair value" in the context of the determination of the price Plaintiff is to be paid for its distributional interest, including the proper definition of fair value, the date as of which fair value is to be determined, the standard of value, the premise of value, and whether fair value includes synergistic value and alleged consequential loss.

The Court will not, at this point, undertake an evaluation of what constitutes "fair value." This issue is not something to be addressed through a motion for summary judgment. The Court will determine the fair value of Plaintiff's distributional interest based upon the evidence adduced at trial, not by evaluating materials submitted in connection with a summary judgment motion, particularly, whereas here, there remains a significant number

of factual disputes. Also, disagreements with respect to the relevance of particular matters can be sorted out at trial.

## MOTION TO AMEND ANSWER AND FILE COUNTERCLAIM

On December 3, 2012, Defendants filed a motion to amend their answer and to file an additional counter-claim. (Filing 126.) Under Federal Rule of Civil Procedure 15, the Court should "freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15. Nevertheless, a party does not have an absolute right to amend and "denial of leave to amend may be justified by undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Amrine v. Brooks*, 522 F.3d 823, 833 (8th Cir. 2008) (quotation and citation omitted). Moreover, "[i]f a party files for leave to amend outside of the court's scheduling order, the party must show cause to modify the schedule." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008) (quotation and citation omitted). "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Id.* at 716-17 (quotation and citation omitted).

On December 14, 2010, the Court issued an order for initial progression of this case (filing 17.) The order provided that any motion to amend pleadings and/or add parties must be filed by February 1, 2011. (*Id.*) Defendants argue that the final progression order (filing 95), entered on July 2, 2012, which does not include provisions related to amended pleadings, superceded the December 14, 2010 initial progression order. This argument is without merit. The final progression order specifically states that "the provisions of the court's earlier, initial progression order remain in effect . . ." (*Id.*) The deadline to amend pleadings was not modified by the subsequent progression order.

Defendants further contend that the deposition of Jeffrie Eastman ("Eastman"), taken on July 27, 2012, provided new information which justifies the filing of an amended answer. Specifically, Defendants claim to have discovered at this deposition that Plaintiff believed that the parties had entered into an agreement that limited Plaintiff's recovery to the return of its capital contribution. Defendants maintain that Eastman's deposition testimony was

14

corroborated by James Stevens in his deposition taken on September 7, 2012. Defendants additionally assert that Stevens acknowledged in his deposition that Plaintiff had a contractual obligation to contribute a portion of the capital that Hastings required.

Defendants have not shown good cause for filing the motion to amend beyond the deadline imposed by the Court or at this late point in the litigation. Despite having taken Eastman's deposition in July, 2012, in which Defendants purportedly learned of the new information, and then having Eastman's testimony allegedly corroborated by Stevens in September, 2012, Defendants waited nearly three months after Stevens' deposition to file their motion to amend. The motion was filed the day before the deposition and summary judgment deadlines[1] established in this case. Trial of this matter, which has been pending for over two years, is set to begin on April 2, 2013. Because Defendants delayed in asserting their motion to amend, and because amending the answer at this late-stage in the litigation would unduly prejudice Plaintiff, the motion will be denied.

Accordingly,

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (filing 139) is denied.

2. Defendants' Motion to File First Amended Answer and Counterclaim (filing 126) is denied.

**DATED February 15, 2013.**

        **BY THE COURT:**

        S/ F.A. Gossett
        **United States Magistrate Judge**

---

[1] Upon motion by Defendants (filing 128), the summary judgment deadline was subsequently extended to December 19, 2012. (Filing 129.)